BILLY JOE SMITH v. WAYNE BOYATT and LAURA BOYATT. No. 8.—467 S.W.2d 312.

Eastern Section. November 17, 1970.

Certiorari Denied by Supreme Court March 1, 1971.

Don C. Stansberry, Jr., Richard E. Herod, Huntsville, for appellants.

Charles B. Sexton, Robert T. Beaty, Oneida, for appellee.

SANDERS, J. This is a suit for personal injuries originated in the Circuit Court of Scott County, Tennessee, where a jury awarded Appellee a judgment for $10,000.00 against Appellant for injuries received while riding as a passenger with Appellant in his car in the State of Indiana. The issues involve the Indiana Guest Passenger Statute.

For convenience, the parties will be referred to as Plaintiff, Billy Joe Smith, and Defendant, Wayne Boyatt, as they appeared in the court below.

Before the trial of the case a nonsuit was taken as to Laura Boyatt.

The case was tried before a jury with The Honorable William I. Davis, Jr., Circuit Judge presiding. The jury found the issues in favor of the Plaintiff and fixed his damages at $10,000.00, upon which judgment was entered by the Court.

The jury was requested to make special finding on two issues. These issues were:

"1. Was the transportation of Billy Joe Smith, on December 3, 1967, at the time of this accident, motivated primarily by business reasons as distinguished from hospitable, friendly, or other social motives?"

On this special issue the jury said, "Yes."

"2. Do you find that the manner of operation of the automobile by Wayne Boyatt constituted a willful and wanton disregard of the safety of his passenger?"

To this issue the jury answered, "Yes."

The Defendant filed a motion for a new trial which was overruled and he has perfected his appeal to this Court and assigned seven assignments of error.

The Defendant's first assignment of error is: "It was error for the Court to refuse to instruct the jury to return a verdict for the defendant upon motion made at the close of the proof in this case, since there was no proof adduced at the hearing of this cause that the plaintiff's suit was not barred by the Indiana Guest Passenger Statute, Burn's Indiana Statutes Annotated, Sec. 47-1021, I.C.1971, 1-3-3-1, as set out in defendant's plea."

The main thrust of the Defendant's brief and argument is directed to the issues involved in this assignment of error and raises the issues which we think are decisive in this case.

BURNS INDIANA STATUTES ANNOTATED, Vol. 8, 1965,

Replacement Vol., p. 62:

47-1021 (10142.1) *Guest of Owner—Right to Damages*

"The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, while being transported without payment, therefor, in or upon such motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the wanton or willful misconduct of such operator, owner or person responsible for the operation of such motor vehicle (Acts, 1929, Chapter 201, Sec. 1, p. 679; 1937 Chapter 259, Sec. 1, p. 1229)."

The facts in general in the case are undisputed. The Plaintiff and Defendant are both natives of Oneida,

Tennessee. They had known each other all of their lives and had graduated from high school together. They were both in their middle twenties and had both served in the Armed Services. After being discharged from Service, they each had secured jobs, the Defendant working for RCA in Indianapolis, Indiana, and the Plaintiff working at Oneida Wood Industry. The Defendant, while visiting in Oneida, on or about November 28, 1967, had suggested to the Plaintiff that if he would go with him to Indianapolis he thought he could get him a better job. Plaintiff decided to leave his employment in Oneida and go to Indianapolis with the Defendant.

Defendant owned a 1962 Ford automobile but the tires were slick and worn out, so Plaintiff removed the wheels with his tires from his car and placed them on the automobile of the Defendant for their use on their trip to Indianapolis. En route to Indianapolis the Plaintiff bought some of the gasoline for the automobile and when they got to Indianapolis Plantiff made his home with the Defendant and the Defendant's sister while looking for employment. Defendant took the Plaintiff several places in Indianapolis where he filed applications for employment and Plaintiff did, on occasion, put gasoline in the automobile. Defendant was doing shift work at RCA and usually went to work at three o'clock in the afternoon and got off at eleven o'clock in the evening. The Plaintiff would usually take the Defendant to work and keep the car during the day and go back after him when he got off from work at night.

On December 2, 1967, the day before the accident occurred, Defendant was scheduled to work a double shift and went to work at seven o'clock in the morning. Plaintiff accompanied him to work and the Defendant asked

the Plaintiff to clean the car up that day. He also asked the Plaintiff to take his sister to the doctor, (his sister, not having a driver's license, and being unable to drive the automobile) after which the Plaintiff was supposed to pick the Defendant up at his employment about eleven o'clock when he got off work. The RCA plant is located about four or five miles from the place where the Plaintiff and Defendant lived. Some time prior to eleven o'clock that evening, the Defendant, along with one, Kelly Kidd, who was a friend of both Complainant and Defendant, on their way to the plant, stopped at a restaurant, had some food and saw a movie and then proceeded to the plant to pick up the Defendant.

As they left the plant the Defendant started driving the car. A Larry Akers who worked with the Defendant also was riding in the car with them. After leaving the plant, either the Defendant or Larry Akers suggested that they get something to eat. They stopped at a drive-in restaurant but the Plaintiff was not interested in eating, as he had previously eaten. After the Defendant and Larry Akers had finished their meal, they were interested in seeing the movie which the Plaintiff and Kelly Kidd had previously seen. Although the Plaintiff had seen the movie once, he watched the movie again in company with the Defendant.

It was about two o'clock in the morning when they left the movie. Defendant was driving, Kelly Kidd was asleep in the automobile and the Plaintiff was riding in the rear seat. When they left the movie they were driving on East Washington Street. It was snowing and sleeting at this time and the windshield wiper on the righthand side was not working. The windshield wiper was working on the driver's side. They proceeded until they came to

the intersection of Kittley Street, at which there was a traffic light. The Defendant's testimony was that the light was green, that there were two lanes and a turn lane, that he looked to see if he could see any traffic coming and didn't see anything; that he turned left straight across the other lane when he suddenly saw a car about five feet from him. This car struck his car in the side with considerable impact.

The Plaintiff testified that he didn't remember anything after entering Washington Street until some six days later when he regained consciousness in the hospital.

As a result of this accident, the Plaintiff was severely injured. Both of his cheek bones were crushed. His jaws were broken. He received severe lacerations of the face. It was necessary to remove one cheek bone completely and use one of his ribs to rebuild that side of his face. His vision has been affected in that he has double vision when he looks to his left or straight ahead. He was a handsome young man before the accident but now his face has been marred and disfigured. He has undergone adverse personality changes as a result of these injuries. He had prolonged pain and suffering. He had over $5,-000.00 in doctors' and hospital bills and will be forced to incur additional expenditures in order to minimize his injuries.

The only witness to testify as to how the accident occurred was the Defendant himself.

There is a conflict in the Defendant's testimony with the statement which he is alleged to have made to Janice Laxton, a sister of the Plaintiff, who resides in Oneida, Tennessee. She testified that she arrived in Indianapolis about 2:00 a.m., the day after the accident occurred; that

while she was in the hospital room she had a conversation with the Defendant about how the accident occurred. Her testimony in this regard is as follows: "A. He said they were all coming home from work, and they came up to this intersection I guess, and that it was snowing and sleeting and the windshield wiper on the right hand side of the car wasn't working and he couldn't see whether or not another car was coming, and he just went on out in the highway.

"Q. Did he say whether or not the light at the intersection was red or green?

"A. He told me it was red."

The Defendant, when asked about his conversation with Mrs. Laxton, stated that he did have a conversation with her at the time involved, but denied that he told her the light was red. He also denied that he told her he couldn't see anything. He stated that he told her that he didn't see the car.

At the conclusion of the Plaintiff's proof and again at the conclusion of all of the proof, the Defendant moved the Court for a directed verdict on the ground that the Plaintiff had failed to show that the Defendant was not exempt from liability under the provisions of the Indiana Guest Passenger Statute, which motion was overruled by the Court.

It is the insistence of the Plaintiff that he was not a guest passenger, but was a paying passenger in that he had placed his wheels and tires on the Defendant's automobile for their use while on the trip to Indiana; that he had helped defray the expenses by buying gasoline and oil; that on the day immediately before the acci-

dent, after taking the Defendant to work, Defendant had requested him to clean up the automobile and asked him to take his sister to the doctor and return and pick him up from work at the plant that night; that these things were done for the benefit of the Defendant and that the Defendant received direct benefits as a result of Plaintiff's carrying out his instructions; that when they left the plant that night and went to the restaurant to eat, this was for the sole benefit of the Defendant, in that Plaintiff had already eaten; that they attended the movie for the benefit of the Defendant because Plaintiff had previously seen the movie; that all of these benefits running to the Defendant were sufficient compensation to remove the Plaintiff from that of a guest passenger to a paying passenger.

In our deliberation on this case, we are bound by the decisions of the courts of the State of Indiana in their construction of the statute involved in this case and, after reviewing a number of cases where their courts have dealt with this statute on the direct points of what is essential for a passenger to become a paying passenger as distinguished from a guest passenger, we find ourselves forced to disagree with the contention of the Plaintiff that his contributions were of such nature as to make him a paying passenger and remove him from the exclusions of the statute.

Under the holdings of the Indiana courts, the burden is upon the Plaintiff to show by preponderance of the evidence that he was a ''fare-paying'' passenger and not a ''guest'' within the meaning of the guest statute. See Liberty Mut. Ins. Co. v. Stitzle (1942) 220 Ind. 180, 186, 41 N.E.2d 133.

In the case of Allison v. Ely et al., 241 Ind. 248, 170 N.E.2d 371, the appellant asserted that the following items constituted payment for transportation within the meaning of the statute:

"(1) transportation for appellant's parents from Oxford, Ohio, to Naperville, Illinois; (2) transportation for appellant's sister from Oxford to Naperville, Illinois; (3) saving of train fare, bus fare, taxicab fare for appellant and his sister; (4) avoidance of discomfort on crowded trains; (5) convenience and a saving of time; and (6) a contribution from appellee to apply on the purchase of gasoline."

The court held that these things did not constitute payment for transportation within the meaning of the statute.

In the case of Liberty Mut. Ins. Co. v. Stitzle, *supra,* (1942) 220 Ind. 180, 185, 41 N.E.2d 133, the Court said:

"The word 'guest' has more of social than business significance. The words 'without payment for such transportation' imply some valuable consideration for the ride. The presence of the person injured must have directly compensated the owner or operator in a substantial and material way. If the trip is primarily social, incidental benefits though monetary do not exclude the guest relationship. If the trip is primarily for business purposes and the one to be charged receives substantial benefit, though not payment in a strict sense the guest relationship does not exist. Expectation of a material gain rather than social companionship must have motivated the owner or operator in inviting or permitting the other person to ride. * * *

> "We do not consider the mere possibility of benefit sufficient to exclude the guest relationship. Some courts have said it must be 'tangible and direct.' The words imply reality, not potentiality. Courts should not be required to search for a benefit. If it is not apparent when it can hardly be said to be substantial or material."

In the case of Graham v. Colon, 7 Cir., 393 F.2d 166 (1968), plaintiff sued the defendant for injuries she sustained because of alleged negligence in the operation of his automobile in which the plaintiff was riding at the time. The defendant testified that he had a conversation with the plaintiff about two weeks before the accident occurred. They were both college students and she had asked whether he could take her from Cincinnati to Chicago and what he would charge her. He told her that on previous trips the several riders had shared the gasoline cost with him and this had come to about three dollars per person, but that if fewer riders came, he would say, "Just give me three dollars, so you don't have the burden of the rest." The plaintiff testified that she "telephoned the defendant about two and one-half weeks before March 5, 1965, asking if he were going to Chicago and how much he would charge"; that he said, "Three Dollars," to which she responded, "Fine," and that she had given him the three dollars when she boarded his automobile on March 5, 1965. The plaintiff in this case had insisted that, under the circumstances, she was entitled to have the court instruct the jury that her payment for transportation in this case in advance, took her out from under the provisions of the guest statute.

The court held that it was not error for the trial court to refuse to so instruct the jury and, in commenting on this matter, stated as follows:

"In effect we have a similar case here. Plaintiff contributed toward the gasoline costs of a trip purely social in nature despite the fact that she paid her contribution in advance as she entered the automobile. She testified that she had it in her hand because she had a bad habit of forgetting things and she handed it to the defendant and told him that she didn't want to forget to give it to him."

Again, in the case of Knuckles v. Elliott (1967), 141 Ind.App. 232, 227 N.E.2d 179, there was an arrangement for the appellant to provide the automobile and appellee to pay the expenses. The court there said that to exclude such cases from the guest passenger statute consideration must be given in excess of expenses incidental to the trip; that there must be a clear intent on the part of the owner of the vehicle to receive something more than mere reimbursement for such expenses as are incurred.

The court also said in the Knuckles case:

"Whether or not the kind of payment here alleged was such as was intended by the Legislature in sec. 47-1021, where it is said, 'while being transported without payment therefor,' is a matter of law to be decided by the court. * * *"

■ In light of the holdings in the foregoing cases, we feel that the Plaintiff failed to show that he was a fare-paying passenger and was a guest within the meaning of the statute; that the question of whether or not he was a guest passenger was a question of law to be decided by the Court and not a question for the jury.

This brings us to the second proposition for consideration. That is, whether or not the injuries of the Plaintiff were "caused by the wanton and willful misconduct" of the Defendant.

Defendant contends that the testimony of Janice Laxton concerning her conversation with the Defendant is material evidence upon which the jury could have found that the Defendant was guilty of willful and wanton negligence. The substance of Mrs. Laxton's testimony is that the Defendant told her, "He couldn't see whether or not another car was coming and he just went out on the highway," and that he also told her that he ran a red light. This testimony is disputed by the Defendant. But in our determination of the case, we must assume that the jury accepted the evidence which was more favorable to their verdict in the case.

If we were dealing here with a simple question of negligence which was the approximate cause resulting in the Plaintiff's injuries, we would have no difficulty in finding that there is material evidence in the record to support a verdict in favor of the Plaintiff. But here we are dealing with "wanton or willful misconduct." Our courts have defined wanton negligence as: "Wanton negligence is heedless and reckless disregard for another's rights with consciousness that act or omission to act may result in injury to another." See Stagner v. Craig, 159 Tenn. 511, 19 S.W.2d 234; Tenn. Central Ry. Company v. Ledbetter, 159 Tenn. 404, 19 S.W.2d 258. Also see Louisville & NRR Co. v. Hadley & wife, 11 Tenn.App. 642.

Thus, willful and wanton misconduct must be more than an individual's disregard for his own safety. It

must be a conscious, reckless invasion of the rights of others.

■ We find no evidence in the record which would bring the actions of the Defendant within this rule.

We find ourselves sympathetic with the Plaintiff in that he had severe, painful, permanent and disabling injuries for which he has no redress, but, under the statute, the court has no discretion.

We feel that Defendant's first assignment of error is well taken. The trial court should have directed a verdict in favor of the Defendant.

In view of our ruling on this assignment, the others are predemitted.

The judgment of the trial court is reversed and the case dismissed with the costs taxed to the Plaintiff.

Cooper, P.J. (E.S.), and Parrott, J., concur.